UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARCUS D. POLK, | |
| Plaintiff, | Case No. 3:20-cv-00069 |
| v. | Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern |
| TONY PARKER et al., | |
| Defendants. | |

To:     The Honorable Eli J. Richardson, District Judge

**REPORT AND RECOMMENDATION**

This civil rights action brought under 42 U.S.C. § 1983 arises from pro se Plaintiff Marcus

D. Polk's incarceration at the Trousdale Turner Correctional Center (TTCC) in Hartsville,

Tennessee.[1] (Doc. No. 92.) Polk alleges that TTCC officials violated his rights under the Eighth

and Fourteenth Amendments of the United States Constitution by failing to protect him from being

assaulted by two other incarcerated people on June 19, 2019. (*Id.*) Defendant Tennessee

Department of Correction (TDOC) Commissioner Tony Parker has moved to dismiss Polk's

Eighth and Fourteenth Amendment claims against him (Doc. No. 99), and Defendants CoreCivic,

Inc.,[2] Corrections Officer Madalyn Huff, former TTCC Associate Warden Yolanda Pittman,

former TTCC Warden Russell Washburn, and former TTCC Chief of Security Rubenard Risper

---

[1]     Polk is now housed at the Northwest Correctional Complex in Tiptonville, Tennessee.
(Doc. No. 1.)

[2]     CoreCivic, Inc., is a private for-profit corporation that contracts with TDOC to operate
TTCC. *See generally Trousdale Turner Correctional Center,* CoreCivic,
https://www.corecivic.com/facilities/trousdale-turner-correctional-center (last visited Feb. 28,
2022).

have moved for summary judgment on Polk's Eighth Amendment claims against them (Doc. No. 109). For the reasons that follow, the Magistrate Judge will recommend that both motions be granted and that Polk's Fourteenth Amendment claims be dismissed.

## I.    Background

### A.    Procedural Background

Polk initiated this action on January 23, 2020, in the United States District Court for the Western District of Tennessee by filing a verified complaint under § 1983 against Parker, Risper, Pittman, Washburn, and corrections officer Alexa Hawkins. (Doc. No. 1.) That Court granted Polk's motion to proceed *in forma pauperis* and transferred the action to this Court as the proper venue. (Doc. No. 4.) This Court screened Polk's verified complaint under 28 U.S.C. § 1915(e)(2) and found that Polk had stated colorable Eighth Amendment claims against Hawkins and Risper in their individual capacities for allegedly failing to protect him from being attacked by people incarcerated in another housing unit. (Doc. No. 6.) Polk's claims against Parker, Washburn, and Pittman were "dismissed without prejudice to [Polk]'s ability to file an amended complaint in which he expressly alleges any personal involvement by the individuals in question in the violation of his civil rights." (*Id.* at PageID# 28.)

Polk amended his complaint to assert claims against Parker, Hawkins, Risper, Pittman, Washburn, and CoreCivic. (Doc. No. 23.) After filing his first amended complaint, Polk learned through discovery that Huff, not Hawkins, was the corrections officer on duty during the events alleged in his original and first amended complaints (Doc. No. 56), and the Court granted him leave to file a second amended complaint naming Huff as a defendant (Doc. No. 91). Polk's verified second amended complaint is now the operative pleading and asserts claims against CoreCivic, Parker, Risper, Pittman, Washburn, Parker, and Huff for violations of Polk's Eighth

and Fourteenth Amendment rights. (Doc. No. 92.) Three incident reports and a letter from Polk to defense counsel are attached as exhibits to the second amended complaint. (Doc. No. 92-1.)

### B. Factual Background

Polk alleges that TTCC uses a wristband policy to ensure that people incarcerated at the facility stay in their assigned housing units. Polk states that the "policy was rarely if ever enforced" and that, on June 19, 2019, Huff allowed two individuals from another housing unit to enter Unit FC, where Polk was housed, without stopping or questioning them. (Doc. No. 92, PageID# 637, ¶ 10(b).) The two individuals entered Polk's cell, where they stabbed Polk twelve times and robbed him. (Doc. No. 92.) Polk repeatedly pressed the emergency call button in his cell but received no response. (*Id.*) Eventually, another inmate got Huff's attention, and Polk was taken to a medical clinic for treatment. (*Id.*) The clinic released Polk and told him to return the next day to see the doctor. When he returned as scheduled, he was told the doctor was out and sent back to his housing unit. (*Id.*) Polk told his brother about the situation, his brother contacted TTCC, and Polk was then taken to the hospital for treatment. (*Id.*)

Polk alleges that TTCC is a "violent and murderous institution[ ]" and that several assaults and one murder had occurred there before his June 19, 2019 attack. (*Id.* at PageID# 640, ¶ 21(c)(i).) He alleges that the defendants were aware of the widespread violence at TTCC and that CoreCivic policies and customs worsened the violence. (Doc. No. 92.) Specifically, Polk asserts that CoreCivic has a custom of "mak[ing] violent incidents disappear in order to dispel the scrutiny that comes from such incidents being investigated and r[u]n up the chain of command." (*Id.* at PageID# 639, ¶ 20(c).) Polk alleges that this policy "creates an even more violent atmosphere" because the people incarcerated at TTCC know that "there is a high likelihood of escaping accountability" for violent acts, (*id.* at ¶ 20(d)), and that the two individuals who attacked him were not disciplined, in accordance with that custom. (Doc. No. 92.) Polk also argues that TTCC's

wristband policy "was inadequate in practice, and amounted to a purely cosmetic corrective measure that offered no protection[ ] to inmates facing the dangers of the widespread violence at the institution." (*Id.* at PageID# 640, ¶ 21(c).)

### C. The Defendants' Dispositive Motions

Parker moved to dismiss Polk's claims against him under Federal Rule of Civil Procedure 12(b)(6), arguing that Polk has not shown that Parker was personally involved in the events that resulted in Polk's injury, as required to state a claim under § 1983, or, alternatively, that Polk's claims against him are barred by the doctrine of qualified immunity. (Doc. Nos. 99, 100.) Polk responds that Parker was personally involved in his injury because he failed to take measures to curb the violence at TTCC and that Parker is not entitled to qualified immunity. (Doc. Nos. 106, 107.)

CoreCivic, Huff, Pittman, Risper, and Washburn filed a motion for summary judgment (Doc. No. 109), accompanied by a supporting memorandum of law (Doc. No. 110) a statement of material facts (Doc. No. 112), and a sworn declaration by Huff (Doc. No. 111). The motion for summary judgment also relies on several declarations and exhibits that the defendants filed in support of an earlier motion for summary judgment. (Doc. Nos. 58, 80–83-13.) CoreCivic, Huff, Pittman, Risper, and Washburn argue that: (1) Polk's claims against Huff are barred by the applicable statute of limitations and Huff was not deliberately indifferent to a serious risk of substantial harm to Polk; (2) Pittman, Risper, and Washburn were not personally involved in Polk's injury; and (3) Polk's injury was not the result of an official policy or custom of CoreCivic. (Doc. No. 110.) Polk responds that (1) his claims against Huff are not barred by the statute of limitations because his second amended complaint relates back under Federal Rule of Civil Procedure 15(c); (2) Pittman, Risper, and Washburn caused Polk's injuries by failing to take action to address the violent environment at TTCC; and (3) CoreCivic has a "custom of allowing violence

4

to flourish" at TTCC. (Doc. No. 117, PageID# 774.) In reply, CoreCivic, Huff, Pittman, Risper, and Washburn argue that (1) Polk did not respond to their statement of material facts and the court should deem those facts undisputed; (2) Polk's claims against Huff do not relate back to the original complaint under Rule 15(c) because Huff did not know about this action until Polk filed his second amended complaint after the statute of limitations had run; (3) there is no evidence showing that Pittman, Risper, or Washburn were involved in the incident that is the basis for Polk's claims; and (4) Polk's allegation that CoreCivic has a custom of permitting violence, cannot survive summary judgment because he has provided no evidence to support it. (Doc. No. 119.)

Polk filed a "response to defendant's reply in support of summary judgment[,]" in which he states that he does not oppose the defendants' statement of undisputed material facts and argues that Pittman, Washburn, Risper, and CoreCivic were deliberately indifferent to a risk to Polk's safety by failing to properly enforce the safety policies in place at TTCC. (Doc. No. 120.) The Court construes this filing as a surreply, which a party may seek leave to file on the rare occasion when "the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Kivilaan v. Am. Airlines, Inc.*, No. 3:04-0814, 2008 WL 11390792, at *1 (M.D. Tenn. Oct. 17, 2008) (quoting *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 113 (D.D.C. 2002)). Polk has not sought the Court's leave to file a sur-reply or shown that a sur-reply is necessary to address matters raised for the first time in the defendants' reply. Accordingly, Polk's surreply (Doc. No. 120) will not be considered in this Report and Recommendation.

## II.     Legal Standard

### A.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded

factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "'labels and conclusions[,]'" "'a formulaic recitation of the elements of a cause of action[,]'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (third alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Polk appears pro se, the Court construes his filings "'liberally'" and holds his complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). There are limits to liberal construction, however, and "courts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

6

**B. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56**

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

7

Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

### III.     Analysis

#### A.      Parker's Motion to Dismiss

Polk alleges that Parker violated the Eighth Amendment because he was aware that violent incidents occurred at TTCC and did not take adequate action to address that violence. (Doc. No. 92.) Specifically, Polk alleges that Parker "failed . . . to insure that disciplinary infractions against inmates . . . were properly adjudicated by the disciplinary board" and did not "take further action to insure the safety of inmates housed at TTC[C] when he became aware that the wrist band policy put in place was inadequate in practice, and amounted to a purely cosmetic corrective measure that offered no protection . . . ." (*Id.* at PageID# 640, ¶21(a), (c).) Polk sues Parker only in his individual capacity. (Doc. No. 92.) Parker argues that Polk's claims against him should be dismissed because Polk's allegations are insufficient to state a claim against him in his individual capacity. (Doc. No. 99.)

Under 42 U.S.C. § 1983, Polk may state a cause of action against anyone who deprived him of "rights, privileges, or immunities secured by the Constitution and laws" of the United States while acting under color of state law. 42 U.S.C. § 1983. However, liability under § 1983 "'cannot be imposed under a theory of *respondeat superior*'" and "'proof of personal involvement is required for a supervisor to incur personal liability.'" *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)). A supervisor

need not necessarily have "physically put his hands on the injured party or even physically been present at the time of the constitutional violation" to be individually liable. *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). Rather, a supervisor may be liable under § 1983 where he "abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (alterations in original) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)).

Polk does not allege that Parker was personally involved in the June 19, 2019 attack. Instead, his claims against Parker are based on an argument that Parker "failed in his capacity as commissioner to maintain the safety of inmates and [s]taff at TTC[C]." (Doc. No. 92, PageID# 640, ¶ 21.) While those allegations might support a claim against Parker in his official capacity, they are not sufficient to state a claim against Parker in his individual capacity. A correctional institution—which is treated as a municipality in this context—"can be liable under § 1983 . . . where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (second alteration in original) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). "Policies promulgated by officials with final policymaking authority may be the basis for attaching municipal liability[,]" but not individual liability. *Tillman v. Decatur Cnty.*, No. 15-01068, 2015 WL 5675843, at *3 (W.D. Tenn. Sept. 25, 2015) (citing *Miller*, 408 F.3d at 813). "Although policies furthered by supervisors may also give rise to supervisory liability, the policies must be specifically advanced by them." *Id.* (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005)). Polk has not alleged that Parker took any action to create, enforce, or instruct TDOC or TTCC employees about CoreCivic's disciplinary policies or the TTCC wristband policy. Nor has he alleged that Parker was personally

involved in the June 19, 2019 attack. Therefore, Polk has not stated a claim against Parker in his individual capacity and Parker's motion to dismiss should be granted.

### B. CoreCivic, Huff, Pittman, Risper, and Washburn's Motion for Summary Judgment

#### 1. Local Rule 56.01 and the Defendants' Initial Burden Under Federal Rule of Civil Procedure 56

This Court's Local Rule 56.01 provides that "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Each of these facts "must be set forth in a separate, numbered paragraph[,]" "must be supported by specific citation to the record[,]" and "the word 'response' must be inserted and a blank space provided that is reasonably calculated to allow the non-moving party sufficient space to respond to the assertion that the fact is undisputed." *Id.* Parties opposing a motion for summary judgment must respond to each asserted fact by "(1) Agreeing that the fact is undisputed; (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." M.D. Tenn. R. 56.01(c) (response to statement of facts). Pro se parties are not excused from this requirement. *Id.* Indeed, the Court's scheduling order in this action instructed the parties to "refer to Federal Rule of Civil Procedure 56 and Local Rule 56.01 for summary judgment procedures[,]" described Local Rule 56.01's requirements, and warned the parties that "[f]ailure to respond in opposition to a statement of material fact may result in the Court assuming that the fact is true for purposes of summary judgment." (Doc. No. 16, PageID# 63.) "If a timely response to a moving party's statement of material facts . . . is not filed within the time periods provided by [the Local Rules], the asserted facts shall be deemed undisputed for purposes of summary judgment." M.D. Tenn. R. 56.01(f) (failure to respond).

CoreCivic, Huff, Risper, Pittman, and Washburn filed a statement of undisputed material facts that complies with the requirements of Local Rule 56.01 and includes citations to affidavits and other documents in the summary judgment record. (Doc. No. 112.) They argue that, because Polk has failed to specifically respond to their statement of undisputed material facts, the facts in the statement must be taken as undisputed under Local Rule 56.01(f) and their motion for summary judgment must be granted. (Doc. No. 119.) While these defendants are correct that Local Rule 56.01(f) requires the Court to take an unaddressed asserted undisputed fact as true, the conclusion that summary judgment is therefore warranted does not automatically follow. Polk's failure to specifically respond to the defendants' statement of undisputed material facts does not lessen these defendants' initial burden to show an absence of any genuine dispute of material fact under Federal Rule of Civil Procedure 56. *See Carver v. Bunch*, 946 F.2d 451, 954–55 ("[A] party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond."); *Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) ("[T]he fact that the movant's affidavits are uncontroverted does not necessarily mean that summary judgment should be granted[;] the ultimate burden of proving the propriety of summary judgment remains on the moving party."). Accordingly, even though Polk did not respond to the defendants' statement of undisputed material facts, the Court must still examine the defendants' evidence to determine if it is sufficient to satisfy their initial summary judgment burden. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) ("'[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)).

### 2. Polk's § 1983 Claims

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Here, the defendants were acting under color of law by performing the "traditional state function" of operating a prison. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)). The remaining question is whether there is evidence in the record from which a reasonable jury could find that the defendants deprived Polk of a federal right.

Polk's claims arise from the Eighth Amendment's prohibition of cruel and unusual punishment, which includes a duty of prison officials to protect incarcerated people from violence at the hands of other incarcerated people. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In order to establish liability under the Eighth Amendment for a prison official's failure to protect him, a plaintiff must demonstrate that the official was deliberately indifferent to a substantial risk of serious harm. *Id.* at 828. A determination of deliberate indifference has both subjective and objective components.

To satisfy the objective component, a plaintiff "must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 834). The subjective component requires the plaintiff to "show that (1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then

12

disregarded that risk.'" *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). Under this standard, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. It is not enough that the official should have perceived a significant risk, but did not. *Id.* at 838. An official's state of mind must be "'more blameworthy than negligence'" before liability will attach. *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997) (quoting *Farmer*, 511 U.S. at 835). Finally, in analyzing the subjective component, the court must consider each defendant's knowledge individually. *See Bishop*, 636 F.3d at 767 (first citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 542 (6th Cir. 2008); and then citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

### a.    Polk's Claims Against Huff

Polk brings a failure-to-protect claim against Huff in her individual capacity, arguing that Huff failed to insure that the emergency call button in his cell worked properly, failed to insure that the wristband policy was followed when she allowed Polk's assailants to enter his housing unit "without stopping them or questioning their purpose for entering the unit" (Doc. No. 92, PageID# 637, ¶ 11), and participated in CoreCivic's "custom of making inmate disciplinary sanctions disappear" (*Id.* at PageID# 643, ¶ 26(c)).

The defendants' statement of undisputed material facts asserts that

- [A]ccording to grievance responses, [the emergency call button in Polk's cell] was in working order when it was tested pursuant to an investigation into Polk's filed grievance. (Doc. No. 112, PageID# 753, ¶ 2.)

- CoreCivic personnel regularly monitored the location wherein Polk was housed to make certain that the inmates were safe and secure, and personnel remained available to the inmates, including Polk, in the event that they had concerns or needs. (*Id.* at PageID# 756, ¶ 19.)

- When she served as a correctional officer at [TTCC], Madalyn Huff . . . performed count procedures, lock checks, and security rounds in the housing unit in an effort to provide for the safety and security of the inmates. She worked to make sure that inmates were accounted for, checked the security and stability of the locks in the housing unit, monitored events throughout the housing unit, and looked into every cell in the housing unit. She also worked to make sure that all inmates who were in the housing unit actually had been assigned to the housing unit and the inmates were not out of place. If an inmate was out of place, she promptly removed the inmate from the housing unit and took steps to ensure that the inmate was returned to his assigned housing unit. (*Id.* at ¶ 20.)

- Huff arrived at Trousdale at 8:26 p.m. on June 19, 2019. She likely would have arrived into Unit FC and started her rounds between 8:41 p.m. and 8:51 p.m. Once she received an update from the correctional officer who she was replacing, Huff prepared for count, specifically by making certain that all inmates were in their respective cells rather than in the day room and by making certain that the locks on all of the cell doors appropriately were locked. (*Id.* at PageID# 756–57, ¶ 21.)

- Huff walked to the cell where Polk was housed, noticed that the cell was extremely messy, and noticed that Polk was sitting down. She saw that Polk had blood on his pants and on his sleeve and that his face looked as though he had been injured. She called a medical emergency at approximately 9:02 p.m. Thus, she had been in Unit FC for only a very brief period of time before discovering Polk and calling a medical emergency. (*Id.*at PageID# 757, ¶ 22.)

These statements are supported by the sworn declarations of Pittman, Risper, Washburn, and Huff. (Doc. Nos. 81–83, 111.) Huff's declaration further states:

- According to documentation from [TTCC], [Huff] arrived at the facility at 8:26 p.m. on June 19, 2019. It typically took her between ten and twenty minutes to get from the front of the facility into the housing unit because of all of the security doors and gates. It then typically took an additional five minutes to talk with the correctional officer who [she] was replacing to learn about any pertinent events from the earlier shift. As a result, [she] likely would have arrived into Unit FC and started [her] rounds between 8:41 and 8:51 p.m. Once [she] received an update from the correctional officer who [she] was replacing, [Huff] prepared for count, specifically by working to make sure that all inmates were in their cells rather than in the day room and by working to make sure that the locks on the cell doors appropriately were locked. (Doc. No. 111, PageID# 748, ¶ 5.)

- If Polk pushed the emergency call button in his cell, it would ring to Central Control and not to Unit FC. This is because someone always was seated at

14

Central Control and monitoring movement and radio traffic in the facility whereas the security personnel in Unit FC often were moving and walking around the housing unit. (*Id.* at PageID# 748–49, ¶ 7.)

These undisputed facts and corroborating record evidence support a finding that Huff was not deliberately indifferent to a substantial risk of serious harm to Polk. It is undisputed that, after Huff arrived for her shift on June 19, 2019, she began "working to make sure that all inmates were in their cells" (Doc. No. 111, PageID# 748, ¶ 5). Because the emergency call button sounded in Central Control, not in Unit FC where Huff was performing rounds, the evidence shows that Huff did not "'subjectively perceive[ ] facts from which to infer a substantial risk to'" Polk by ignoring his emergency call button and "'did [not] in fact draw the inference'" until she found Polk in his cell during her rounds. *See Richko*, 819 F.3d at 915. It is undisputed that, after Huff found Polk in his cell, she called for emergency assistance (Doc. No. 92, PageID# 638, ¶ 15; Doc. No. 112, PageID# 757, ¶ 22), indicating that Huff did not disregard a substantial risk of harm to Polk, *see Richko*, 819 F.3d at 915. Therefore, Huff has met her burden of showing that she was not deliberately indifferent to a substantial risk of serious harm to Polk.

Polk has not offered "significant probative evidence" in response to Huffs' asserted undisputed facts that is sufficient to create a genuine issue of fact for trial on his claims against her. *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). In fact, Polk has not offered any evidence in support of his claims beyond the allegations of his verified complaint. A "verified complaint . . . carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). But, here, the allegations of Polk's verified complaint alone are not sufficient to defeat summary judgment.

To constitute sufficient evidence to support or oppose a motion for summary judgment, an affidavit—and, thus, a verified complaint—"must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify

on the matters stated." Fed. R. Civ. P. 56(c)(4). Courts therefore must evaluate whether claims in affidavits submitted at summary judgment are made from personal knowledge. *See, e.g.*, *Totman v. Louisville Jefferson Cnty. Metro. Gov't*, 391 F. App'x 454, 463 (6th Cir. 2010) (finding that plaintiff's verification "that his first amended complaint 'is true and correct to the best of [his] knowledge and belief'" "indicate[d] that the allegations of the complaint go beyond [the plaintiff's] personal knowledge and extend to matters within [his] belief" and that allegations based only on beliefs "do not meet the evidentiary standard set forth in . . . the Federal Rules of Civil Procedure" (first alteration in original)); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that affiant's "statement . . . based upon his 'belief' . . . did not demonstrate the personal knowledge required by" Rule 56). The burden to establish that a witness has personal knowledge of the statements made in an affidavit or verified complaint falls to the party relying on that testimony. *See Wilson v. Budco*, 762 F. Supp. 2d 1047, 1057 (E.D. Mich. 2011).

Like the complaints in *Totman* and *Alpert*, Polk's second amended complaint includes a certification that his allegations are "true to the best of [his] information, knowledge, and belief." (Doc. No. 92, PageID# 645.) There is no indication that Polk's allegations that Huff permitted individuals from other housing units to enter Unit FC on June 19, 2019, failed to ensure that Polk's emergency call button worked properly, and participated in a CoreCivic custom of making inmate disciplinary sanctions disappear are based on Polk's personal knowledge. They are therefore not sufficient evidence to create genuine issues of material fact for purposes of summary judgment, and Huff is entitled to summary judgment on Polk's claims against her.[3]

---

[3]     Because Huff has shown that she is entitled to summary judgment, the Court need not determine whether Polk's claims against her are barred by the applicable statute of limitations. *See Judkins v. Bates*, No. 2:14-0058, 2015 WL 6828800, at *3 (M.D. Tenn. Nov. 6, 2015) (declining to consider statute of limitations arguments in light of recommendation that motions for summary

### b. Polk's Individual Capacity Claims Against Washburn, Pittman, and Risper

As discussed, liability under § 1983 "'cannot be imposed under a theory of *respondeat superior*'" and "'proof of personal involvement is required for a supervisor to incur personal liability.'" *Grinter*, 532 F.3d at 576 (quoting *Miller*, 408 F.3d at 817 n.3). Accordingly, to succeed on his individual capacity claims against Washburn, Pittman, and Risper, Polk must show that those defendants "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

The defendants' statement of undisputed material facts establishes that:

- Pittman, Risper, and Washburn were not aware of threats to Polk's safety, were not aware that the correctional officer assigned to Polk's housing unit allegedly was not following the wristband policy, and did not have any involvement in or connection to Polk's assault or the subsequent response by security and medical personnel. (Doc. No. 112, PageID# 752, ¶ 1.)

- Pittman, Risper, and Washburn were not assigned to work in Unit FC on June 19, 2019, and they did not respond to Unit FC following the incident. They did not instruct or encourage security personnel to refuse to provide Polk with protection from other inmates or to allow inmates from other housing units to enter Polk's housing unit or cell. They were also not aware of an alleged malfunction of the emergency call button, which, according to grievance responses, was in working order when it was tested pursuant to an investigation into Polk's filed grievance. (*Id.* at PageID# 752–53, ¶ 2.)

These assertions are supported by the sworn declarations of Washburn, Pittman, and Risper. (Doc. Nos. 81–83.) Washburn, Pittman, and Risper thus have provided evidence establishing that they did not subjectively perceive facts from which to infer a substantial risk to Polk, did not draw the inference, and did not disregard the risk. *See Richko*, 819 F.3d at 915. The evidence also indicates that Washburn, Pittman, and Risper were not directly involved in misconduct by any employee

---

judgment be granted), *report and recommendation adopted by* 2015 WL 8752308 (M.D. Tenn. Dec. 14, 2015).

whom they supervised. *See Bellamy*, 729 F.2d at 421. There is no indication that any of the allegations against Washburn, Pittman, and Risper in Polk's verified second amended complaint are based on personal knowledge. Therefore, the allegations in Polk's verified second amended complaint are not sufficient evidence to create genuine issues of material fact, and summary judgment is warranted on his claims against Washburn, Pittman, and Risper.

### c. Polk's Claims Against CoreCivic and Official Capacity Claims against Washburn, Pittman, and Risper

The Supreme Court has held that a government body or private entity performing a government function "can be found liable under § 1983 . . . where the [entity] *itself* causes the constitutional violation at issue" through execution of its own policies or customs. *City of Canton*, 489 U.S. at 385 (citing *Monell*, 436 U.S. at 691). The overarching question in resolving such claims is "whether there is a direct causal link between [the entity's] policy or custom and the alleged constitutional deprivation." *Id.* For purposes of municipal liability claims, "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Therefore, Polk's claims against Washburn, Pittman, and Risper in their official capacities are subject to the same standard as his claims against CoreCivic.

Courts in this circuit engage in a two-pronged inquiry when considering such claims under § 1983. *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (quoting *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505 (6th Cir. 1996). The court first asks whether the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law. *Powers*, 501 F.3d at 607 (first citing *Cash*, 388 F.3d at 542; and then citing *Alkire*, 330 F.3d at 813). Second, the court asks whether the defendant entity is "responsible for that deprivation." *Cash*, 388 F.3d at 542 (citing *Doe*, 103 F.3d at 507); *cf. Powers*, 501 F.3d at 607.

18

Under the first prong of the analysis, courts must consider whether the plaintiff has asserted "rights [that] are federally protected such that, if proven, § 1983 will provide relief for their infringement." *Powers*, 501 F.3d at 607; *see also Cash*, 388 F.3d at 542 ("First, the court must determine whether the plaintiffs have asserted the deprivation of a constitutional right." (citing *Doe*, 103 F.3d at 505)). Importantly, this prong asks the court to "examin[e] the nature of the right claimed to have been infringed upon" and not to determine the merits of the claim. *Doe*, 101 F.3d at 506; *see also Cash*, 388 F.3d at 542 ("The threshold question is 'whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property.'" (quoting *Arnett v. Myers*, 281 F.3d 552, 564 (6th Cir. 2002))). Polk has a constitutionally protected right under the Eighth Amendment to be free from violence at the hands of other incarcerated people. *Farmer*, 511 U.S. at 833. He bases his claims against CoreCivic on that constitutionally protected right, satisfying the inquiry's first prong.

His claims fail, however, on the second prong of the inquiry, at which plaintiffs "must 'identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). A plaintiff may prove the existence of a policy or custom that is actionable under § 1983 in four ways:

> The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "The Sixth Circuit applies specific inquiries for . . . claims based on each theory to determine whether plaintiffs have identified a custom or policy, connected the policy to the defendant . . . entity, and shown that the

custom or policy was the moving force behind the alleged injury as required." *Whitworth v. CoreCivic, Inc.*, No. 3:17-cv-01121, 2019 WL 1427934, at *13 (M.D. Tenn. Mar. 29, 2019); *see also Connick v. Thompson*, 563 U.S. 51, 61–63 (2011) (articulating standard for failure-to-train theory); *Thomas*, 398 F.3d at 429 (articulating four-part inquiry for claims based on inaction theory).

Polk alleges that CoreCivic is liable for violations of his Eighth Amendment rights because CoreCivic "failed . . . to insure that disciplinary infractions against inmates at the institution were [ ]properly adjudicated by the disciplinary board[;]" had a "custom of making inmate disciplinary sanctions disappear to underreport the violence pervasive at the institution[;]" "failed . . . to insure that the staff at TTC[C] were properly trained[;]" "failed . . . to insure that the wrist band policy in place at [TTCC] was enforced to protect the safety of staff and inmates[;]" and failed to insure that the emergency call buttons inside the cells worked properly. (Doc. No. 92, PageID# 641, ¶ 22(b)–(f).)

The defendants assert in their statement of undisputed material facts that CoreCivic's relevant policies and customs "are designed and intended to ensure that employees of CoreCivic of Tennessee, LLC protect inmates and timely render necessary aid to inmates" (Doc. No. 112, PageID# 753, ¶ 3; *see also id.* at PageID# 755, ¶ 17), and that "CoreCivic personnel regularly monitored the location wherein Polk was housed to make certain that the inmates were safe and secure, and personnel remained available to the inmates, including Polk, in the event that they had concerns or needs" (*id.* at PageID# 756, ¶ 19). They also state that

> CoreCivic of Tennessee, LLC employees must complete a minimum of 40 hours of orientation before undertaking their assignments. In addition to orientation, all new custody personnel must complete a minimum of 120 hours of custody training and an additional 40 hours of on-the-job training. Along with this, custody personnel subsequently must complete a minimum of 40 hours of training each calendar year. . . .

The training is designed and intended to educate employees of CoreCivic of Tennessee, LLC regarding performing routine rounds throughout the facility, conducting count seven times in every twenty-four hour period, closely monitoring inmates, ensuring that the needs of inmates are met, attempting to preempt inmate altercations, promptly responding to inmate altercations, ensuring that injured inmates timely receive necessary attention—medical and otherwise, and appropriately punishing inmates who violate facility rules, among other things.

(*Id.* at PageID# 758, ¶¶ 25, 26.) Core Civic supports these assertions with Washburn's sworn declaration. (Doc. No. 83.)

CoreCivic also filed copies of its relevant policies, which contain several provisions related to Polk's claims. Policy 9-123, Security and Control, Inmate Movement, provides that CoreCivic staff will control, supervise, and authorize "[a]ll inmate movement from one location to another . . . ." (Doc. No. 83-2, PageID# 510.) Policy 506.13, Identification of Inmates, provides that:

Wardens/Superintendents at each TDOC facility and privately managed facilities shall establish procedures governing the mandatory use of colored wristbands to be worn by all TDOC inmates assigned to general population and other units approved by the Warden/Superintendent. These wristbands shall be attached to the inmate's wrist and shall be utilized to enhance security measures of inmates attempting to enter unauthorized areas of the facility, such as housing units [to] which the inmates are not assigned. Warden/Superintendent shall establish procedures on how wristbands are monitored at strategic locations.

(Doc. No. 83-3, PageID# 519.) Several other policies are directed at maintaining safety and security, including Policy 8-2, Facility Safety Authority/Team Safety Program (Doc. No. 83-6); Policy 506.06, Searches (Doc. No. 83-7); Policy 9-07, Security Inspections (Doc. No. 83-8); Policy 14-4, Inmate/Resident Rights (Doc. No. 83-9); Policy 404.09, Protective Services (Doc. No. 83-10); Policy 404.10, Administrative Segregation, Placement, Review and Release (Doc. No. 83-11); Policy 9-16, Emergency Response Team (Doc. No. 83-12); and Policy 13-34, Medical Emergency Response (Doc. No. 83-13).

To the extent Polk "alleges that his injuries were caused by derogation of applicable security policies, not because of them[,]" this Court has already held that such allegations are

insufficient to state a claim against CoreCivic or its employees in their official capacities. (Doc. No. 6, PageID# 28.) Because CoreCivic has offered evidence establishing that it does not have "a custom of tolerance or acquiescence of federal rights violations," *Thomas*, 398 F.3d at 429, Polk must present "'significant probative evidence'" in rebuttal to survive summary judgment. *Napier*, 636 F.3d at 225 (quoting *Anderson*, 477 U.S. at 248). He has not done so. While Polk alleges generally that CoreCivic has a custom of "making violent incidents disappear . . . ," (Doc. No. 92, PageID# 639, ¶ 20(c)), this conclusory allegation, without more, does not create a genuine dispute of fact regarding the existence of a CoreCivic custom that directly caused Polk harm. *See Jackim v. City of Brooklyn*, No. 1:05-cv-1678, 2007 WL 893868, at *20 (N.D. Ohio Mar. 22, 2007) (finding that plaintiffs failed to establish municipal custom or policy where they "simply pointed to one event—and relied on the doctrine of respondeat superior—as the basis for imposing liability upon the municipal defendant"). Therefore, summary judgment should be granted with respect to Polk's Eighth Amendment claims against CoreCivic and against Washburn, Pittman, and Risper in their official capacities.

### C. Polk's Fourteenth Amendment Claims

Under 28 U.S.C. § 1915(e)(2), the Court is obligated to review the complaint of a plaintiff proceeding *in forma pauperis* and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)–(iii). The standard for reviewing pleadings under § 1915(e)(2) is the same as the standard for evaluating motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court has not yet screened Polk's second amended complaint under 28 U.S.C. § 1915(e)(2).

Polk alleges violations of the Fourteenth Amendment on the same grounds as his Eighth Amendment claim. (Doc. No. 92.) Because Polk is not a pretrial detainee, his § 1983 claims "must

be for redress of eighth amendment, not fourteenth amendment substantive due process, rights." *Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners . . . . Because this case involves prison inmates rather than pretrial detainees . . . , [we hold] that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.") Therefore, Polk's Fourteenth Amendment claims are subject to dismissal.

## IV. Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Parker's motion to dismiss (Doc. No. 99) and CoreCivic, Huff, Pittman, Washburn, and Risper's motion for summary judgment (Doc. No. 109) be GRANTED. The Magistrate Judge further recommends that Polk's Fourteenth Amendment claims against all defendants be DISMISSED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 1st day of March, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge